[No. C053200. Third Dist. Mar. 28, 2008.]

NILES FREEMAN EQUIPMENT et al., Plaintiffs and Appellants, v.
RON JOSEPH, as Director, etc., et al., Defendants and Respondents.

**COUNSEL**

Greenberg Traurig, Gene Livingston, Kathryn Doi and Ray Sardo for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Jonathan K. Renner, Acting Assistant Attorney General, Stephen Acquisto and Geoffrey Graybill, Deputy Attorneys General, for Defendants and Respondents.

**OPINION**

**MORRISON, J.**—This case involves the California Disabled Veteran Business Enterprise (DVBE) program within the Department of General Services (Department), which is designed to benefit qualified disabled veterans and their businesses by giving them preferences in state contracting. (Mil. & Vet. Code, § 999 et seq.; further unspecified section references are to this code.)

Daniel Moody and Niles Freeman each had a contracting business, Moody Construction and Niles Freeman Excavating (NFX), respectively. Moody is a qualified disabled veteran, but Freeman is not. Moody and Freeman created a partnership, Niles Freeman Enterprises (NFE), certified as a DVBE by the Department. Freeman ran NFE, and derived most of its profits.

The Department "decertified" NFE as a DVBE, after an administrative law judge (ALJ) upheld the Department's conclusion that NFE did not meet the definition of a DVBE.

The Department later suspended plaintiffs NFE, Moody, Moody Construction, Freeman, and NFX from participating in any state contracts for three years. Plaintiffs appealed and lost at an administrative hearing, except

that the period of suspension was reduced to one year. All then filed this unsuccessful administrative mandamus petition to set aside the suspensions.

Although the notice of appeal lists all plaintiffs, we previously granted the request of Freeman and NFX to dismiss their appeal. We shall affirm the judgment as to NFE, Daniel Moody and Moody Construction (collectively, Moody, except as context indicates).

## STANDARD OF REVIEW

The trial court concluded that the suspension order impacted fundamental rights and required application of the independent judgment standard of review.

We agree. Depriving a contractor of the right to bid on a contract implicates a liberty interest. (*Marvin Lieblein, Inc. v. Shewry* (2006) 137 Cal.App.4th 700, 720 [40 Cal.Rptr.3d 547] (*Lieblein*); see also *Golden Day Schools, Inc. v. State Dept. of Education* (2000) 83 Cal.App.4th 695, 707 [99 Cal.Rptr.2d 917] (*Golden Day*); *Stacy & Witbeck, Inc. v. City and County of San Francisco* (1995) 36 Cal.App.4th 1074, 1086–1087, fn. 6 [44 Cal.Rptr.2d 472] (*Stacy*).)

On appeal, we review the trial court's factual conclusions for substantial evidence and its legal conclusions de novo. (See *Handyman Connection of Sacramento, Inc. v. Sands* (2004) 123 Cal.App.4th 867, 880–881 [20 Cal.Rptr.3d 727] (*Handyman*).)

## BACKGROUND

Although we are reviewing the denial of a petition to overturn the *suspension* order, some of the issues raised on appeal relate to the *decertification* order. The facts found at the first administrative hearing provide a useful context, because the findings at the second hearing, although of more serious consequence, accord with the earlier findings.

### Statutory Background

"The administering agency [of the DVBE program] is the Department of General Services, except in the case of contracts for professional bond services." (§ 999.5, subd. (a).)

Generally, the Department may certify an entity as a DVBE if it is owned "at least 51 percent" by one or more disabled veterans and its "daily business operations" are managed by one or more disabled veterans. (§ 999, subd. (b)(7)(A).)

"This article includes language similar to that . . . (commencing with Section 10115) . . . of the Public Contract Code and does not create an independent or additional goal or program." (§ 999.13.) The referenced section encourages "minority, women, and disabled veteran business enterprises" in various ways, some challenged on theories not relevant herein.

The Department has adopted regulations detailing aspects of the DVBE program, including eligibility. (See, e.g., Cal. Code Regs., tit. 2, § 1896.61.)

Section 999.9, as amended effective 2004 (Stats. 2003, ch. 632, § 4), providing for civil, criminal and administrative penalties for violations of the DVBE program, is set out in the appendix, *post.*

## Decertification Hearing

On February 17, 2004, ALJ Roman issued a written decision after an administrative hearing, and that decision and documents leading up to it generally establish the following.

Daniel Moody was "a duly qualified disabled veteran" and a licensed contractor with an existing business named Moody Construction. He made a partnership agreement with Niles Freeman to create NFE. This is a distinct entity from NFX, Freeman's separate business.

The partnership agreement states NFE was to be owned 51 percent by Moody and that NFE's purpose was to create a DVBE entity. The partnership would provide firefighting services to California's Department of Forestry and Fire Protection (CDF). Freeman applied for DVBE certification and the Department certified NFE for a three-year period. Of $12,000 generated by NFE's contracts in 2002, Moody was paid $1,000 and Freeman was paid $11,000.

The Department "concluded that [the partnership] had failed to demonstrate Mr. Moody's managerial and operational control of the enterprise," and sought further information from the partnership. Eventually, on October 2, 2003, the Department sent NFE a three-page letter, captioned "DVBE Intent to [Revoke]," stating in part that it had determined NFE was "not in compliance with" specifically identified regulations defining a DVBE, based on facts summarized under each claimed area of noncompliance.

On October 7, 2003, NFE filed an administrative appeal. On Tuesday, December 9, 2003, an attorney wrote to ALJ Roman and stated that he had been retained *that week* to represent NFE at the hearing set for Monday, December 15, 2003. The attorney sought a continuance based on calendar

conflicts. ALJ Roman denied the request, stating that the notice of hearing had been issued on November 14, 2003, and no good cause for the request was shown.

As duly scheduled, on December 15, 2003, a hearing was held at which evidence (including the testimony of Moody and Freeman) was taken. On appeal Moody's briefs emphasize isolated comments by ALJ Roman at the hearing, portraying the proceeding as *favorable*. But ALJ Roman's written decision was *unfavorable*. We quote two significant passages:

"What emerges from a review of the documentation and testimony provided herein by both [the Department] and [the] partners is that [NFE] lacks any business equipment and the documentation necessary to establish Mr. Moody as a qualifying disabled veteran for purposes of certification. Despite protestations to the contrary, Mr. Freeman, largely engaged in furthering the partnership, has a greater clarity on the business enterprise than . . . Mr. Moody. [NFE] has no distinct employees or work force (except as provided by Mr. Freeman) subject to Mr. Moody's supervision, no materials (except as largely provided by Mr. Freeman) and no discrete facilities (except as provided by Mr. Freeman). The manner in which [NFE's] activities are candidly vetted by Mr. Freeman's determination of financial distribution (to include compensation), notwithstanding the expressed terms of the Partnership Agreement or the partners' protestations, when balanced with the partners' actual conduct of [NFE] activities, functions to belie the Partnership Agreement's import. Simply put, Mr. Moody renders no commercially useful function to [NFE]."

"The partners, seeking to properly increase their business opportunities, fashioned a business entity that, on paper, commences with an investiture in Mr. Moody of a 51% interest. The business practice, at least with respect to financial capitalization has been, during the period of analysis: 0. Distribution of income has, however, favored Mr. Freeman. Further, it becomes abundantly clear that Mr. Moody, in several respects, fails to meet the expressed regulatory provisions relating to both managerial and operational control of the business. . . . What the partners clearly created does not appear to be a partnership that would vest any degree of meaningful or qualifying control in Mr. Moody but, instead, a joint venture for the limited purpose of gaining D.V.B.E. status by and through Mr. Moody with its concomitant financial benefits." (Fns. omitted.)

ALJ Roman upheld the Department's decertification of NFE, and no review of his decision was sought.

## Suspension Hearing

On March 4, 2005, the Department sent Freeman and Moody written notice of its intent to suspend them, NFE, Moody Construction and NFX, "from bidding on, or participating as either a contractor, subcontractor, or supplier in any state contract or project for 3 years for violation of M&VC Section 999.9(a)(1), (2) and (4)." The gist of the claim was that NFE was a sham entity that subcontracted all of its CDF work to NFX, and the partners "knowingly and with intent to defraud" sought and obtained the DVBE certification, made knowingly false statements and obtained or attempted to obtain "public moneys to which they were not entitled."

The notice alleged that Freeman had been providing CDF equipment since 1982 as NFX, and continued to provide the same services through the shell of NFE once NFE was issued the DVBE certification. Nearly 94 percent of the income from CDF contracts with NFE went to NFX, and only about 6 percent went to Moody. Moody Construction, owned by Moody, has DVBE certification, but does not own the type of equipment commonly needed by CDF, bulldozers and water trucks; Freeman owns bulldozers. Therefore, the notice alleged, "the only added benefit to Mr. Moody as a partner of NFE was the receipt of 5 percent of the profit on Mr. Freeman's equipment provided to CDF by NFE."

The notice, accompanied by voluminous exhibits, gave instructions on how to appeal the proposed suspension. A timely administrative appeal was filed.

After a prehearing conference on May 13, 2005, before ALJ Hoover, occupying 99 pages of transcript, he ordered briefing on issues including the Department's suspension authority. This prehearing order also states that "any evidentiary hearing must comport with due process requirements as found in the general provisions in the Administrative Procedure Act. In the interim, the ALJ has issued this Order to permit the orderly preparation for hearing." This order provides for discovery to be completed by May 20, 2005, and sets out other hearing rules. At oral argument in the trial court, Moody's counsel incorrectly stated that this order merely addressed "identifying exhibits and witnesses."

After both sides filed prehearing briefs, ALJ Hoover conducted a second prehearing conference on June 17, 2005. At that conference Moody's counsel complained about the paucity of detail in the witness statements, particularly regarding witness Bob Sheehy, and ALJ Hoover ordered the Department to "by the end of the day identify with specificity what Mr. Sheehy is going to testify to and send that to Miss Doi [Moody's counsel]. [¶] [Department's counsel]: Yes." After determining that the Department had no discovery

complaints, ALJ Hoover asked Moody's counsel: "Okay. All right. So next, do you have any questions or anything that you want to raise? [¶] MS. DOI: No, your Honor."

On July 20, 2005, plaintiffs filed this petition, which was stayed pending a final administrative decision.

ALJ Frink conducted a hearing on August 22 to 26, 2005, and on November 3, 2005, found against plaintiffs, but reduced the penalty to a one-year suspension, the maximum allowed by statute at the time of the offending conduct.

ALJ Frink's 26-page decision finds that Freeman and Moody created NFE with knowledge that Freeman would run the business, although nominally Moody would be the majority owner. Freeman ran NFE and received most of its profits. The partners gave misleading responses when the Department began investigating NFE's DVBE eligibility, such as falsely stating that Moody managed the business.

We will set out some of ALJ Frink's specific findings.

To comply with executive orders, "CDF instituted a practice of giving a preference to DVBE vendors to supply emergency firefighting equipment, specifically bulldozers, water tenders, and privately-owned fire engines . . . ." Freeman or NFX owned bulldozers; Moody or his company owned no bulldozers, only excavators. They made a partnership agreement which allowed the partnership to buy equipment, but it did not buy any equipment. When NFE supplied equipment owned separately by either partner, that partner would get 95 percent of the profit.

Under the DVBE rules, and nominally under the partnership agreement, Moody was to manage NFE. However, the partnership was named "Niles Freeman Equipment"; the address and contact numbers on the partnership agreement and DVBE application were the same as for NFX, although admittedly the "physical location" on the application was Moody's home address; the Federal Employer Identification Number (FEIN) was the same as NFX's; the agreement states equipment operators "will be provided" by Freeman and he would handle "all payroll responsibilities"; and Freeman, not Moody, signed the application, with the notation, "for Dan Moody."

Because the employer ID number, business address, and telephone numbers of Freeman or NFX were used, the partners "reasonably believed that all inquiries for work would be received by Mr. Freeman." They "falsely stated that Mr. Moody was the primary individual responsible for handling financial

transactions and agreements, when the parties knew that NFE had no separate bank accounts, that Mr. Freeman was responsible for handling payroll responsibilities and hiring operators for equipment rentals, and that Mr. Freeman would be entering into contracts for use of his separately-owned equipment, which comprised the overwhelming majority of NFE's anticipated business."

After a close review of specific CDF contracts and payments in 2002 and 2003, ALJ Frink concluded, "there was no appreciable difference between Mr. Freeman's management and control of NFX and the conduct of business of NFE, as it pertained to CDF contracts. Mr. Freeman exerted complete control over NFE's 2002 [contract] services. Mr. Moody did not exercise meaningful management and control of NFE's business operations, except to receive a percentage of the proceeds from the DVBE-related projects." The one time CDF *did* contact NFE about an excavator, Moody declined the job because his excavator was already in use. "This is the only time NFE was contacted for the use of equipment owned by Mr. Moody; all other contacts were for bulldozers and transport vehicles owned by Mr. Freeman, for which Mr. Freeman made all utilization decisions."

In June 2003, the partners responded in writing to a Department inquiry. They stated Moody managed the business, but *all* contracts NFE made were signed by Freeman, and Freeman handled *all* of NFE's finances. They implied that Freeman merely fielded telephone calls for NFE because it was hard to reach Moody by cell phone, when in fact Freeman made all decisions about "bulldozers and support equipment, which were the only rentals actually engaged in by NFE." They made other false or misleading responses.

The partners also made false or misleading statements in a written response to a CDF inquiry.

In August 2003, the Department sent further questions to NFE, and the partners made further false or misleading replies, consistent with their earlier responses.

On August 31, 2003, NFE made a contract with CDF, using an employer ID number Moody obtained, but the contract was *signed by Freeman alone, and used NFX's address.* On September 8, 2003, the partners opened a bank account in NFE's name, *but the address and phone number of the account were those of NFX.*

ALJ Frink discredited the partners' claims of lack of bad intent. In particular, "Mr. Moody's testimony that he 'managed' Mr. Freeman was not credible."

Mandamus Proceeding

On November 22, 2005, plaintiffs filed an amended administrative mandamus petition, and the parties stipulated to stay the suspension order during this action.

On June 2, 2006, the trial court issued a judgment, incorporating a 20-page statement of decision, denying the petition. The trial court upheld ALJ Frink's factual findings. In particular, the trial court discredited Moody's claim that he managed the business, describing in detail the evidence that undermined Moody's claim.

All plaintiffs timely filed a joint notice of appeal. Based on their written request, we dismissed the appeal as to NFX and Freeman.

## DISCUSSION

### I. The Department's Authority to Suspend DVBE's

The parties dispute (1) whether the Department had the authority to suspend DVBE entities when Moody engaged in the conduct underlying the suspension, (2) whether a 2004 amendment granted it such authority, and (3) whether the amendment permits suspension where the offending conduct took place before 2004.

We conclude the Department always had authority to suspend fraudulent DVBE's; in any case, it certainly had such authority after 2004, and such authority, if newly granted in 2004, could be exercised based on prior unlawful conduct.

### A. The Department's Pre-2004 Authority

Before any of the conduct at issue in this case took place, Government Code section 14600 stated (as it still does): "The Legislature declares that a centralization of business management functions and services of state government is necessary to take advantage of specialized techniques and skills, provide uniform management practices, and to insure a continuing high level of efficiency and economy. A Department of General Services is created to provide centralized services including, but not limited to, planning, acquisition, construction, and maintenance of state buildings and property; purchasing; printing; architectural services; administrative hearings; and accounting services. The [Department] shall develop and enforce policy and procedures

and shall institute or cause the institution of those investigations and proceedings as it deems proper to assure effective operation of all functions performed by the department and to conserve the rights and interests of the state."

■ Moody observes that earlier in this proceeding the Department did not interpret its pre-2004 authority to allow it to bring suspension proceedings. Even if the Department misunderstood its authority, that does not equate to a formal administrative interpretation of a statute within an agency's purview (cf. *Pacific Gas & Electric Co. v. Department of Water Resources* (2003) 112 Cal.App.4th 477, 496 [5 Cal.Rptr.3d 283]), nor change the scope of the Department's actual legal authority (cf. *Bank of Italy v. Johnson* (1926) 200 Cal. 1, 15 [251 P. 784]). Thus, any mistake by the Department does not change the scope of its power, as conferred by the Legislature, to "institute or cause the institution of those investigations and proceedings as it deems proper . . . to conserve the rights and interests of the state." (Gov. Code, § 14600.)

■ Moody asserts that the pre-2004 version of section 999.9 is a more specific statute that *limited* the Department's powers over the DVBE program, notwithstanding Government Code section 14600. He relies on cases holding that where two statutes conflict, the more specific statute should govern. (See, e.g., *In re Brent F.* (2005) 130 Cal.App.4th 1124, 1129 [30 Cal.Rptr.3d 833].)

■ We see no conflict. Former section 999.9 first listed unlawful acts (subd. (a)), then stated that a violation of those provisions would result in a civil penalty (subd. (b)), and then stated that "Any person" who performs the unlawful acts "shall, in addition to the [civil penalties,] be suspended from bidding on" contracts for between 30 days and one year (subd. (c)). (Former § 999.9; Stats. 1991, ch. 567, § 4, pp. 2673–2674.)

The next subdivision provided, "The awarding department shall report all alleged violations of this section to the Office of Small and Minority Business. The office shall subsequently report all alleged violations to the Attorney General who shall determine whether to bring a civil action against any person or firm for violation of this section." (Former § 999.9, subd. (d); Stats. 1991, ch. 567, § 4, pp. 2673, 2674.)

Moody asserts that *only the Attorney General* could proceed against alleged violators. That is not what the statute says, it provides a way to report violations to the Attorney General, to consider whether or not to "bring a civil action."

■ What Moody overlooks is that an administrative proceeding, such as a license suspension hearing, is *not* a "civil action": "[Code of Civil

Procedure, s]ection 22 defines 'action' as 'an ordinary proceeding *in a court of justice* by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense.' (Italics added.) Section 23 states: 'Every other remedy is a special proceeding.' We said in *City of Oakland v. Public Employees['] Retirement System* (2002) 95 Cal.App.4th 29 [115 Cal.Rptr.2d 151]: 'An administrative proceeding is neither a "civil action" . . . nor a "special proceeding of a civil nature". . . .' " (*Lomeli v. Department of Corrections* (2003) 108 Cal.App.4th 788, 796 [134 Cal.Rptr.2d 179] (*Lomeli*); see *Cartwright v. Board of Chiropractic Examiners* (1976) 16 Cal.3d 762, 780 [129 Cal.Rptr. 462, 548 P.2d 1134]; *Bold v. Board of Medical Examiners* (1933) 133 Cal.App. 23, 25 [23 P.2d 826].)

██ Thus, the Legislature has defined an "action" to refer to a *court* proceeding, the courts of this state have long interpreted that term to *exclude* administrative hearings, and we presume the Legislature knew exactly what it meant when it used that long-defined and long-interpreted term in former section 999.9, subdivision (d). (See *Viking Pools, Inc. v. Maloney* (1989) 48 Cal.3d 602, 609 [257 Cal.Rptr. 320, 770 P.2d 732] [Legislature presumed to act in light of existing statutes and judicial decisions].)

Former section 999.9, subdivision (d) did not *prohibit* the Department from exercising its power to suspend violators by initiating an administrative suspension. Thus, it did not conflict with Government Code section 14600, quoted above, as Moody asserts: The statutes were in harmony.

### B. The 2004 Amendment to Section 999.9

As amended, effective 2004, section 999.9, the full text of which can be found in the appendix, provides for civil, criminal and administrative penalties. (Stats. 2003, ch. 632, § 4.)

Section 999.9, subdivision (a) defines several unlawful acts, such as to "Knowingly and with intent to defraud . . . obtain, [or] retain" DVBE certification. (§ 999.9, subd. (a)(1).)

Section 999.9, subdivision (b) makes those unlawful acts punishable as misdemeanors. Contrary to Moody's view, that did not reflect a change in the law. As the Attorney General states, criminal liability for defrauding the DVBE program existed since before any of the conduct involved in this case. (See Pub. Contract Code, § 10115.10, subd. (b); Stats. 1993, ch. 1032, § 6, pp. 5793, 5794.)

Section 999.9, subdivision (c)(1) in part provides: "The Department of General Services shall suspend any person who violates subdivision (a) from

bidding on, or participating . . . in, any state contract or project for a period of not less than three years, and if certified as a [DVBE], the department shall revoke the business' certification for a period of not less than three years. . . . The suspension and revocation shall apply to the principals of the business and any subsequent business formed or financed by, or affiliated with, those principals."

■ Moody argues this language merely gives the Department the administrative duty to suspend a violator *when the violation is determined by some other entity*, such as a "court of law," but that it does not give *the Department* any power to determine whether a violation occurred. We disagree: "The Department . . . shall suspend any person who violates subdivision (a) . . . ." (§ 999.9, subd. (c)(1).) Grammatically, the *Department* takes the stated action, that is, the *Department,* not someone else, "shall suspend" violators.

■ Further, the Department's explicit power to *grant* DVBE certification confers the implicit power to *suspend* DVBE certification. (See *McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 361 [261 Cal.Rptr. 318, 777 P.2d 91] ["It is well established . . . that administrative agencies with licensing power also have the authority to revoke or suspend licenses."].)

Part of Moody's argument is based on legislative materials contained in his request for judicial notice, previously granted. Those documents show that the Legislature wanted to ensure greater scrutiny over the DVBE program, in response to reports by the Sacramento Bee and the State Auditor that detailed fraud in the DVBE program. They do not speak to the issues in this case.

■ Further, we look to legislative materials when and only when a party has identified a statutory ambiguity requiring interpretation. The fact we previously granted the motion for judicial notice does not mean we found that the statute was ambiguous. (See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30 [34 Cal.Rptr.3d 520].)

" 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . .' " (*Alameida v. State Personnel Bd.* (2004) 120 Cal.App.4th 46, 58 [15 Cal.Rptr.3d 383] (*Alameida*); see also *Handyman, supra,* 123 Cal.App.4th at p. 882.) A party demonstrates ambiguity by tendering an alternative candidate of meaning, that is, a grammatically plausible reading of the language at issue. (See *Estate of Dye* (2001) 92 Cal.App.4th 966, 976 [112 Cal.Rptr.2d 362]; *Zabetian v. Medical Board* (2000) 80 Cal.App.4th 462, 466–467 [94 Cal.Rptr.2d 917].)

The language here does not call for interpretation because Moody's candidate of meaning does not reasonably account for the language in the

statute. He reads the language "The Department . . . shall suspend any [violators]" to mean something like "When someone else finds wrongdoing, the Department shall suspend violators." That candidate of meaning does not reasonably account for the language chosen by the Legislature, but adds a new concept. Therefore, Moody's repeated assumption that various interpretive tools can or should be wielded in his favor fails, because his candidate of meaning is not reasonable and thus no ambiguity exists.

Moody also implies that the 2004 amendment made purely technical changes. "The Legislature's clarification of section 999.9(c) was accomplished by re-writing the first sentence of subdivision (c) ['any person who violates . . . shall . . . be suspended . . .'] to eliminate the passive voice. . . . One of the improvements Legislative Counsel regularly makes is to change the passive voice to the active. That is the case here." The Legislative Counsel's Office does not focus on ferreting out avoidable passive constructions: Its prime function is to substantively assist in drafting legislation. (See, e.g., *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1225–1226 [70 Cal.Rptr.2d 745]; *id.* at pp. 1236–1237.) The use of the passive voice in the prior version of the statute did not obscure its meaning. (Cf. *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1241–1242 [60 Cal.Rptr.3d 631] ["a reasonable consumer would not likely be deceived by the mere use of the passive voice . . ."].) In any event, as stated, the current statute is clear: "The Department . . . shall suspend" DVBE cheats. (§ 999.9, subd. (c)(1).)

■ We accept Moody's implied premise that a statutory ambiguity can be latent, that is, not apparent on the face of the language, and that such ambiguity may be shown by reading parallel or similar statutory language. (See *People v. Galindo* (2006) 142 Cal.App.4th 531, 537 [48 Cal.Rptr.3d 241]; *City of Sacramento v. Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 795 [27 Cal.Rptr.2d 545].)

First, Moody makes the following claim:

"In the pre-2003 version of the statute, subdivision (c) did not specify how the suspension would be implemented. The 2003 amendments now specify that [the Department] is responsible for implementing the suspension and revocation of DVBE certifications. These would be summary administrative procedures based on the *judicial* determination that a violation of subdivision (a) had occurred.

"The above interpretation of subdivision (c) is also consistent with the specific provisions governing suspension in the Public Contract Code. Specifically, Public Contract Code sections 10285-10285.5 [part of the State

Contract Act] outline the circumstances under which 'any state agency' may suspend a person from bidding upon a public works contract 'with the agency' if that person has been **_convicted_** *by a court of competent jurisdiction* of any charge of fraud, bribery, collusion, or conspiracy in connection with bidding upon a prior public works contract. (Public Contract Code § 10285.) Before suspending a person pursuant to these provisions, the state agency must provide a hearing upon reasonable notice. (*Id.,* § 10285.2.)

"The fact that the Public Contract Code expressly authorizes agencies to bring suspension proceedings under certain circumstances suggests that there is no general authority for agencies to bring such proceedings under Government Code section 14600. The Public Contract Code suspension proceedings rely on a conviction in a court of competent jurisdiction; the agencies are not bringing an independent action. (*Id.,* § 10285.1.) The provisions also articulate due process requirements. (*Id.,* § 10285.2.) All of these factors are absent in the proceedings currently brought by [the Department] against Appellants. Accordingly, [the Department] lacks authority to bring the current proceedings." (Original italics, boldface and underscoring.)

The relevant State Contract Act (Pub. Contract Code, § 10100 et seq.) statute applies to "any charge of fraud, bribery, collusion, conspiracy, *or any other act in violation of any state or federal antitrust law.*" (Pub. Contract Code, § 10285.1, italics added.) The Attorney General asserts this means the sections apply only to antitrust cases. One decision, not cited by the parties, supports Moody on this point: "[U]nder the State Contract Act (Pub. Contract Code, § 10100 et seq.), any state agency can suspend (for up to three years) a contractor from bidding on or being awarded a public works contract with that agency if that person has been convicted of fraud, bribery, collusion, etc., in connection with any public works contract. (Pub. Contract Code, § 10285.1.) The act provides for notice and a hearing prior to any suspension. (*Id.,* at § 10285.2.)" (*Stacy, supra,* 36 Cal.App.4th at p. 1094.) But even accepting that these sections apply to all criminal fraud *convictions,* not merely antitrust convictions, the fact that the Legislature has established procedures following *criminal convictions* in the State Contract Act does not mean it precludes other remedies provided by other statutes. We see no conflict with section 999.9.

Moody also points to statutes applicable to a contract preference program similar to the DVBE program: "There are telling discrepancies between the legislative histories of the statutes behind the Small Business and DVBE Programs. In amending the statutes governing the Small Business Program, for example, the Legislature made clear its intention to provide [the Department] with independent authority to initiate suspension proceedings to address violations of the Small Business Program statutes. [Citation.] Unlike the amendments to the DVBE Program statutes, the amendments to the Small Business

Program statutes contained explicit language granting [the Department] independent authority to initiate suspension proceedings."

 The relevant section states the Department "shall revoke the small business or microbusiness certification of any person that violates" a list of fraudulent acts similar to section 999.9, subdivision (a), and suspend their ability to bid on or supply to any state contracts. (Gov. Code, § 14842.5, subd. (c).) Moody perceives significance in the fact that no similar language appears in section 999.9. But we see nothing in the small business statute which raises any latent ambiguity *in section 999.9*; it merely shows that other language could be used to accomplish the same result. The Legislature is not required to use the same language to accomplish the same ends.

 Moody raises a new claim in the reply brief, that the suspension is punitive in nature and therefore the interpretive rule of "lenity" should apply. This claim is forfeited because by withholding it to the reply brief Moody deprived the Department of the ability to address it. (See *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) In any event, the statutory language is not ambiguous, calling for an interpretive choice, and the suspension is not punitive: "Although debarment can have a severe economic impact on contractors, it 'is not intended as punishment. It is, instead, a necessary means to enable the contracting governmental agency to deal with irresponsible bidders and contractors, and to administer its duties with efficiency.' " (*Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 542 [133 Cal.Rptr.2d 527] (*Underground Contractors*).) We need not address other new claims in the reply brief, both because they are forfeited and because they are subsumed within our analysis, as stated above.

## C. Retroactivity

Moody asserts that exercise of the authority granted by the 2004 amendment to section 999.9 based on conduct occurring before that amendment's effective date would be an impermissible retroactive application of the statute. Although we have concluded the Department always had the ability to suspend DVBE cheats, we will address this claim as if the 2004 amendment newly granted the Department such authority.

The trial court rejected this claim as follows: "[E]ven if the Court were to assume that [the Department] did not have authority to bring an independent suspension action prior to the 2004 amendments, the Court still would rule that the suspension action against Petitioners was not an improper retroactive application of the 2004 amendments. This is not a situation where an act lawful at the time it was done was retroactively rendered unlawful. Rather,

both before and after the 2004 amendments, Military and Veterans Code § 999.9 made it unlawful [to defraud the DVBE program]. In addition, both before and after the 2004 amendments, any person who violated subdivision (a) of that section was subject to the penalty of suspension. Thus, at most, the 2004 amendments merely changed (or broadened) which agency (or agencies) were authorized to bring a suspension action. This is not an impermissible retroactive effect."

We agree with the trial court. The case relied on by the trial court, *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216 [32 Cal.Rptr.2d 807, 878 P.2d 566] (*20th Century*), involved the validity of insurance rate reductions ("rollbacks") as applied to rates charged during a period when the lawful amount of the rates was uncertain, due to the enactment of an initiative purporting to lower the rates. The California Supreme Court rejected a claim that requiring reductions in rates already charged would be impermissible:

 "[E]ven if the rate regulations as to rollbacks might be deemed 'retroactive,' they cannot be deemed impermissibly so. ' "Primary" retroactivity'—to coin a phrase—obtains when regulations 'alter[] the *past* legal consequences of past actions.' [Citations.] That is not present here. ' "Secondary" retroactivity' occurs when regulations 'affect[] the *future* legal consequences of past transactions . . . .' [Citation.] That is indeed present. '[B]ut such " 'secondary' retroactivity" is an entirely lawful consequence of much agency rulemaking and does not by itself render a rule invalid.' [Citation.] That it is an '*entirely* lawful consequence' means just that: it does not itself offend any law, including the United States and California Constitutions and their respective due process clauses. [¶] . . . [¶]

"We may observe in passing that the rate regulations as to rollbacks were not adopted until after the rollback year. That fact cannot itself render them impermissibly 'retroactive.' For about a year prior to the approval of Proposition 103, insurers were on actual notice of the rate rollback requirement provision itself." (*20th Century, supra,* 8 Cal.4th at pp. 281–282.)

Here, the only different consequence, if any, is that that agency bringing the suspension action is the Department. The suspension action was not based on conduct *later* made unlawful.

Moody claims that before the amendment "the *past* legal consequences of fraudulent conduct were that, upon referral by [the Department], the Attorney General might elect to pursue a civil action. If the Attorney General elected not to bring such a civil action, the dispute was over. No further legal consequences would inure." We do not agree, because at best for Moody perhaps no *civil action* "would inure" if the Attorney General declined to file

one, but as we have explained, an administrative proceeding is not a civil action. (*Lomeli, supra,* 108 Cal.App.4th at p. 796.) The asserted immunity from a civil action would not make the fraudulent conduct lawful, and there would be nothing improper about allowing the Department to pursue DVBE violators the Attorney General chose not to pursue. This would not be like allowing claims based on conduct not actionable when done (cf. *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 848 [123 Cal.Rptr.2d 40, 50 P.3d 751] [repeal of product liability immunity for tobacco did not revive claims based on conduct while statute was operative]), nor like implying an intent to revive time-barred claims (cf. *Moore v. State Bd. of Control* (2003) 112 Cal.App.4th 371, 378–379 [5 Cal.Rptr.3d 116] (*Moore*) ["when the Legislature intends to revive time-barred claims it does so expressly"]).

*Moore,* relied on by Moody, involved the claims procedures applicable to a crime victim restitution fund. Under the old rule, the administering board could grant relief to late claimants, but only for up to three years. Crime victims filed late claims because they were not told about the existence of the fund, and their applications for relief from the time limits were denied because they were over three years late. After they sued, the Legislature eliminated the three-year cap on relief from the time limits. (*Moore, supra,* 112 Cal.App.4th at pp. 375–377.) We held that the law applicable at the time the claims were filed applied: There was no intent to make the new law retroactive, no intent to revive barred claims, and "When the Legislature establishes a right or benefit that was unknown at common law and, in the same statute, establishes a time within which a claim to the right or benefit must be exercised, the time period is substantive and jurisdictional." (*Id.* at pp. 378–379.) Similar circumstances are not present in this case.

*Johnson v. Alexis* (1983) 143 Cal.App.3d 82 [191 Cal.Rptr. 529], also cited by Moody, involved the suspension of a driver's license for recidivist drunk driving. An amendment changed how to calculate a five-year washout period for prior convictions. Under the old law, Johnson's prior conviction would be deemed washed out; under the new law, effective after his second act of drunk driving but before that conduct resulted in a conviction, the prior would count, and trigger a suspension. (*Id.* at p. 84.) The court concluded that the amendment did not clearly indicate an intent that it apply retroactively, and that applying the new law would impair Johnson's "preexisting right . . . to continue his licensed driving unless he suffered two convictions of drunk driving within five years." (*Id.* at p. 85.) Here, no *new* penalties have been imposed.

Moody claims in a footnote in the reply brief: "Appellants do not agree that their penalties were not enhanced as a result of the post-2004 amendments. Under the post-2004 version of section 999.9, Appellants were

suspended one-third of the maximum suspension period. Applying the same one-third penalty under the pre-2004 version of section 999.9, Appellants' would have only been suspended for four months."

To the extent we understand this claim, it is incorrect. The post-2004 suspension "shall" be "for a period of not less than three years." (§ 999.9, subd. (c)(1).) The pre-2004 suspension could be for from 30 days to one year, with a provision for an extended period, "up to three years" for additional violations. (Former § 999.9, subd. (c); Stats. 1991, ch. 567, § 4, p. 2673.) Moody's three-year suspension was reduced by ALJ Frink to one year, explicitly for the purpose of conforming the suspension to the pre-2004 law, in effect when the relevant conduct took place. There was no imposition of a "one-third" suspension, there was no "enhanced" penalty, and there is no properly articulated claim that the ALJ should have imposed something less than a one-year suspension.

*Hughes Aircraft Co. v. United States ex rel. Schumer* (1997) 520 U.S. 939 [138 L.Ed.2d 135, 117 S.Ct. 1871] (*Hughes*), also relied on by Moody, is somewhat closer to this case, but materially distinguishable.

*Hughes* addressed an amendment to the federal False Claims Act (FCA; Gov. Code, § 12650 et seq.). Before the amendment, a federal court was required to dismiss an action by a private plaintiff ("relator") if it was " 'based on evidence or information the Government had when the action was brought.' " (*Hughes, supra*, 520 U.S. at p. 945 [138 L.Ed.2d at p. 143], quoting an earlier version of 31 U.S.C. § 3730.) The action in *Hughes* was based on such information. In 1986, before the action was filed, the statute was amended to allow such actions to proceed in some cases. Although the conduct underlying the action took place under the old rule, the action was filed after the new rule took effect. The defendant claimed the new rule could not be applied to allow actions based on conduct that took place under the old rule.

The court applied the general rule that a statute will not be construed to apply retroactively unless such intent is clearly stated, therefore "if the 1986 amendment has a retroactive effect, then we presume it will not apply to the conduct alleged in this case, which occurred prior to its effective date." (*Hughes, supra*, 520 U.S. at p. 946 [138 L.Ed.2d at p. 143].) The amendment had a retroactive effect because it abolished an affirmative defense available to the defendant at the time the conduct took place, that is, the defense that the action was based on information known to the government. (*Id.* at p. 948 [138 L.Ed.2d at p. 144].) This was significant for the following reason:

"The extension of an FCA cause of action to private parties in circumstances where the action was previously foreclosed is not insignificant. As a

class of plaintiffs, *qui tam* relators are different in kind than the Government. They are motivated primarily by prospects of monetary reward rather than the public good. . . . [¶] . . . [¶]

"In permitting actions by an expanded universe of plaintiffs with different incentives, the 1986 amendment essentially creates a new cause of action, not just an increased likelihood that an existing cause of action will be pursued." (*Hughes, supra*, 520 U.S. at pp. 949–950 [138 L.Ed.2d at p. 145].)

Here, assuming the 2004 amendment granted new authority to suspend to the Department, the amendment might be said to have allowed "an expanded universe of plaintiffs," as Moody asserts. But we disagree that any new plaintiff had any "different incentives," in the language of the Supreme Court. (*Hughes, supra*, 520 U.S. at p. 950 [138 L.Ed.2d at p. 145].) A qui tam relator is often a mercenary, seeking only the bonus available for uncovering fraud. But, akin to the Attorney General, the Department is an arm of California government, charged with acting to further California's public policies; it does not seek private reward for its actions. At worst the 2004 amendment merely increased the "likelihood that an existing cause of action will be pursued," which the *Hughes* court did *not* view as a retrospective effect. (*Ibid.*)

 Finally, the gist of retroactivity is whether a law "gives a different and potentially unfair legal effect to actions *taken in reliance on the preenactment law.*" (*California Trout, Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585, 609 [255 Cal.Rptr. 184], italics added.) Moody could not reasonably have relied on NFE's ability to escape consequences for fraud, based on the hope that the Attorney General would conclude the case did not merit the attentions of his office.

## II. Due Process

Moody argues that the administrative suspension hearing violated his due process rights because the Department neither adopted hearing regulations pursuant to the Administrative Procedures Act (Gov. Code, § 11340 et seq.) (APA) nor followed the default adjudication procedures within the APA.

 As far as Moody's briefs show, no due process objections were lodged at the hearing before ALJ Frink. We conclude he has forfeited this structural claim because he did not raise it at the administrative hearing. We have repeatedly held that issues not presented at an administrative hearing cannot be raised on review. (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 874–875 [50 Cal.Rptr.3d 636] [CEQA case]; *Alameida, supra*, 120 Cal.App.4th at p. 53 [discipline hearing]; see 1 Cal.

Administrative Mandamus (Cont.Ed.Bar 3d ed. 2007) Laying the Foundation at the Administrative Hearing, § 3.3, pp. 49–50.)

 Further, to the extent Moody's briefs can be read to raise an as-applied claim, that is, that he was actually prejudiced in this case, such a claim "requires the appellant to present a factual analysis of the individual case" (*Banning v. Newdow* (2004) 119 Cal.App.4th 438, 454 [14 Cal.Rptr.3d 447]), but no such claim was tendered to the trial court, therefore any purported as-applied due process claim is *doubly* forfeited: Because prejudice would require consideration of the degree to which Moody's case was impaired, it is a factual issue forfeited by the failure to litigate it in the trial court. (*Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; *City of Oakland v. Public Employees' Retirement System, supra*, 95 Cal.App.4th at p. 52.)

We observe that at prehearing conferences the parties could have raised any procedural or discovery issues, and, indeed, ALJ Hoover issued a detailed order regulating some procedures, including discovery. At the beginning of the hearing itself ALJ Frink stated that the parties had discussed procedural issues off the record, including the fact that she would issue a final decision, not a proposed decision for the Department to adopt, and the fact that the Department would have the burden of proof. Either party could have made a record of any irregularities or continued objections, including due process objections, at that time.

Moody claims "At the prehearing conferences, Appellants' counsel repeatedly objected to [the Department's] failure to apprise Appellants of the procedures that would govern the suspension proceedings." No record citation is given for this assertion, therefore we disregard it. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 [126 Cal.Rptr.2d 178].) The next sentence of Moody's brief claims that ALJ Hoover "shared" Moody's concerns, and *that* assertion is followed by citations and quotations from the prehearing conferences. In the cited portions of the record, ALJ Hoover expressed concern about the need for clarity in the procedures, but Moody's counsel lodged no due process objections. As indicated earlier, ALJ Hoover made a prehearing order requiring "that any evidentiary hearing must comport with due process requirements" under the APA, and if they did not, it was Moody's counsel's duty to object. Moody did not preserve the due process claims raised on appeal.

We observe that in certain cases a party claiming that an administrative hearing is unfair may present new evidence in a mandate proceeding, for example, to show bias on the part of the decision maker. (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 485 [22 Cal.Rptr.3d 772] [but Nasha

*raised issue* at administrative hearing].) Such cases are inapposite because Moody did not tender any evidence to the trial court in an effort to show that plaintiffs were hampered in any way at the administrative hearing. In the trial court Moody simply claimed that the hearing violated his due process rights because no governing regulations for such a proceeding had been adopted, claims he failed to present to the ALJ's. He did not articulate any claim of prejudice.

Nonetheless, we briefly address Moody's forfeited claims.

Government Code section 11415.10 partly states that, "If no other governing procedure is provided . . . an agency may conduct an adjudicative proceeding under the administrative adjudication provisions of" the APA. Moody argues: "Under Government Code section 11415.10, when an agency conducts an adjudicative proceeding, it must do so according to the procedures prescribed in the statutes and regulations governing that type of proceeding. If there are no statutes or regulations applicable to the proceeding in question, the agency *may* proceed according to the adjudicatory provisions of the APA. However, if the agency elects not to proceed according to the APA's adjudicatory provisions, then . . . the agency must promulgate regulations to govern the proceeding. Failure to promulgate such regulations renders any action taken as a result of the proceeding invalid." (Original italics, boldface and underscoring.)

Contrary to Moody's view, Government Code section 11415.10 says an agency "may" use the default APA procedures in certain cases but that statute does not mandate setting aside a decision when an agency neither uses the default procedures nor adopts procedures specific to the particular kind of case.

 We agree with Moody that "underground" regulations, that is, rules of general application not adopted in compliance with the APA's rulemaking provisions, are generally invalid. (See *Kings Rehabilitation Center, Inc. v. Premo* (1999) 69 Cal.App.4th 215, 217 [81 Cal.Rptr.2d 406].) However, the record does not support his claim of an underground regulation. The Department sent this matter to the Office of Administrative Hearings for resolution, and that office sent the matter to an ALJ. There is no showing the Department adopted a "rule . . . of general application" (Gov. Code, § 11342.600) about DVBE suspension hearings.

On appeal, Moody bases his claim for prejudice on two grounds. First, "Appellants were never provided a copy of the procedure employed by [the Department] and, consequently, were left to speculate as to the nature of the

procedures that would be followed." Second, "the exclusive discovery procedures set forth in [the APA] were never made available to Appellants in this case."

As for discovery, we have described earlier one minor discovery objection at a prehearing conference, which was promptly resolved by ALJ Hoover. We have not been cited to any other discovery issues raised by Moody.

As for notice of the procedures, Moody had enough notice.

Moody cites a federal case where an agency conducted a suspension hearing absent regulations *stating grounds for suspension.* (*Gonzalez v. Freeman* (D.C. Cir. 1964) 118 U.S. App.D.C. 180 [334 F.2d 570] (*Gonzalez*).) The agency "debarred" a company from contracting pending an investigation, and later suspended it for five years, without stating any reasons. The court observed: "In short, we construe, the pertinent statutory scheme as authorizing debarment but as not authorizing debarment without either regulations establishing standards and a procedure which are both fair and uniform *or basically fair treatment of appellants.*" (*Id.* at p. 580, italics added.)

The facts of this case are not like those in *Gonzalez, supra,* 334 F.2d 570. Here, the Department issued a lengthy notice of intent to suspend, which detailed specific statutory grounds, and also summarized the evidence supporting suspension. Two prehearing conferences were attended by Moody's counsel and procedures were discussed. A hearing before a neutral ALJ was held at which the parties were represented by counsel and procedures were discussed. At the hearing itself, Moody had the opportunity to present evidence and challenge opposing evidence. ALJ Frink issued a detailed written decision describing the facts and the law supporting suspension. In our view, Moody received "basically fair treatment" as defined by the *Gonzalez* decision; he has not even come close to showing a due process violation. (See *Underground Contractors, supra,* 108 Cal.App.4th at p. 544 [notice of ground of debarment, ability to confront evidence and assistance of counsel at hearing]; *Stacy, supra,* 36 Cal.App.4th at pp. 1087–1088 ["notice of hearing, notice of charges, advance synopsis of evidence, opportunity to present witnesses and documentary evidence, and the right to presence of counsel" as well as prehearing depositions, meant that the inability to cross-examine witnesses did not violate due process].)

Moody cites to *Golden Day, supra,* 83 Cal.App.4th 695, but the problem in that case was that a hearing was not held before an impartial decision maker. (*Id.* at pp. 710–711 [one panel member "was in the position of judging the

correctness of his own decision"].) "Here, unlike in *Golden Day,* the administrative appeal was entirely conducted by an independent hearing officer." (*Lieblein, supra,* 137 Cal.App.4th at p. 724.)

Thus, even if the Department erred by failing either to adopt procedural rules for DVBE suspension hearings or to use the default procedures under the APA, Moody has not shown that such irregularity, of itself, violated due process and he has not demonstrated prejudice in his particular case.

### III. Collateral Estoppel

Moody claims the Department "should have been collaterally estopped from bringing the suspension action because it failed to seek suspension in the prior administrative action . . . which involved identical facts and circumstances."

The briefing suggests that Moody means to invoke claim preclusion (res judicata), on the theory that the suspension *could* have been litigated in the earlier case, rather than issue preclusion (collateral estoppel), on the theory that the exact issues *were* litigated. (See *People v. Damon* (1996) 51 Cal.App.4th 958, 968, fn. 10 [59 Cal.Rptr.2d 504] (*Damon*) ["collateral estoppel . . . would merely prevent him from relitigating . . . whether he violated the Automotive Repair Act, which was decided adversely to defendant in the administrative action"].)

■ Moody quotes *Sutphin v. Speik* (1940) 15 Cal.2d 195, 202 [99 P.2d 652]: "If the matter was within the scope of the action, related to the subject-matter and relevant to the issues, so that it *could* have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged. The reason for this is manifest. A party cannot by negligence or design withhold issues and litigate them in consecutive actions."

We agree with Moody that this principle generally applies to administrative adjudications. (*George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1989) 49 Cal.3d 1279, 1290 [265 Cal.Rptr. 162, 783 P.2d 749]; *Knickerbocker v. City of Stockton* (1988) 199 Cal.App.3d 235, 242 [244 Cal.Rptr. 764].) But it does not help Moody here.

The issue at the decertification hearing was whether or not NFE met the definition of a DVBE. ALJ Roman concluded NFE did not meet the relevant criteria. In the transcript of the hearing ALJ Roman made a few comments suggesting the NFE partners had or might have had an innocent intent. But he made no *findings* about their intent, as their intent was not relevant to the issues before him.

The issue at the suspension hearing was whether NFE's principals *fraudulently* obtained and sought to retain DVBE status. The evidence partly overlapped, but this hearing required the Department to prove Moody's and Freeman's intent, an issue not relevant in the decertification proceeding. (See *People v. Rodriguez* (1984) 160 Cal.App.3d 650, 654 [206 Cal.Rptr. 79] ["the central issue before the Department of Social Services was whether Rodriguez' benefits should be *terminated*; the question of her *fraud* [pursued in a criminal case] was never directly raised"].)

Moody's reliance on ALJ Hoover's comments at a prehearing conference, suggesting he thought the proceedings should have been consolidated so as to avoid "dragging this person through the same information and causing them to spend a lot of money to defend basically the same information," is unpersuasive, because ALJ Hoover was not purporting to adjudicate the issue of whether the later proceeding was *barred* by the former proceeding, nor did he have the power to do so.

█ In *Mahon v. Safeco Title Ins. Co.* (1988) 199 Cal.App.3d 616 [245 Cal.Rptr. 103], we explained, quoting a treatise: " 'An adjudicative determination of a claim by an administrative tribunal does not preclude relitigation in another tribunal of the same or a related claim based on the same transaction if the scheme of remedies permits assertion of the second claim notwithstanding the adjudication of the first claim.' " (*Id.* at p. 622, reiterated by *Damon, supra,* 51 Cal.App.4th at p. 970.)

Moody asserts: "Here, [the Department] initiated separate decertification and suspension proceedings for redress of the same primary right—the right of the public to an above-board DVBE program utilized solely by legitimate DVBEs." We disagree with this characterization of the "primary right."

█ " 'California defines a "cause of action" in accord with Pomeroy's "primary right" theory. . . . A cause of action consists of (1) a *primary right* possessed by the plaintiff and a corresponding *primary duty* imposed upon the defendant, and (2) a *delict* or *wrong* committed by the defendant which constitutes a breach of such primary right and duty.' " (*Skrbina v. Fleming Companies* (1996) 45 Cal.App.4th 1353, 1364 [53 Cal.Rptr.2d 481], original italics; see *Lodi v. Lodi* (1985) 173 Cal.App.3d 628, 631 [219 Cal.Rptr. 116]; 4 Witkin Cal. Procedure (4th ed. 1997) Pleading, §§ 24–26, pp. 85–88.)

█ The Department has the right (and duty) under the statutes to certify those DVBE applicants who meet the stated criteria. (§§ 999, subd. (b)(7)(A), 999.5.) And, as we concluded earlier in this opinion, the Department has a concomitant right (and duty) to *decertify* noncompliant DVBE's, that is, those that, for whatever reason, no longer meet the criteria for DVBE status.

But contrary to Moody's view, the Department has a separate statutory right (and duty) to *suspend fraudulant* DVBE's from bidding on state contracts. (§ 999.9, subd. (c)(1).) This deters applicants from trying to cheat the system and is " 'a necessary means to enable the [Department] to deal with irresponsible bidders and contractors, and to administer its duties with efficiency.' " (*Underground Contractors, supra,* 108 Cal.App.4th at p. 542.)

Thus, the Department has been charged by the Legislature with two separate duties regarding DVBE's and the Legislature has set forth separate remedies for violation of those separate duties. Thus, this is not a case of a single primary right being split into two (administrative) actions.

Accordingly, we reject Moody's characterization of the Department's "primary right," and conclude it was not required to consolidate the decertification and suspension proceedings.

## IV. Equitable Estoppel

Moody claims the notice of intent to decertify lulled the partners into believing no other action would be taken. The notice, after describing how to file an appeal, states: "De-certification as a DVBE does not prevent NFE from bidding on State of California contracts. Many businesses obtain state contracts successfully without DVBE certification."

At the *suspension* hearing Freeman testified this language influenced the partners not to press the matter because "We thought the issue was settled."

We disagree that the Department should be equitably estopped. This language was accurate and the partners could not reasonably have relied on it to their detriment. "Estoppel arises out of the rule that '[w]henever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it.' (Evid. Code, § 623.) The essential ingredients of an estoppel are (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct be acted upon, or must so act that the other party has a right to believe that it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) the other party must rely on the conduct to her injury." (*Moore, supra,* 112 Cal.App.4th at p. 384.)

First, " '[N]either the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public.' " (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th

278, 301 [130 Cal.Rptr.2d 436]; see *Moore, supra,* 112 Cal.App.4th at p. 385.) Here, the suspension reduces fraud and an estoppel would allow wrongdoers to escape the consequences of their actions with no corresponding benefit.

Second, no reasonable person would have read the language to mean anything more than what it said: "De-certification as a DVBE does not prevent NFE from bidding on State of California contracts." That statement was clear and accurate.

Third, Moody claims the statement induced the partners to forgo appealing NFE's decertification and in general discount the importance of the *decertification* proceeding. But this mandamus proceeding seeks review of the *suspension* order. At the administrative hearing leading to the suspension order plaintiffs were represented by able counsel, and Moody fails to explain how the prior decertification order affected his defense in the suspension proceeding.

Finally, as ALJ Frink stated in her decision, at the time of the decertification hearing the partners knew they were being investigated for fraud and therefore had a strong incentive to fight that proceeding, and even hired counsel, although belatedly. They were not lulled into inaction.

## V. Substantial Evidence

Moody asserts that some of the factual findings made by ALJ Frink and upheld by the trial court on independent review are not supported by substantial evidence.

Moody states the facts in his favor. Contrary evidence is omitted, and he teases out the most favorable inferences from evidence, as if he had prevailed before the ALJ or the trial court. For example, he states the Department "admits that NFE's partners always cooperated . . . and provided responses and documentation" when asked. This misleads, because the responses and documentation, although perhaps timely provided, were found by the ALJ and trial court to be replete with false and misleading statements about NFE's operations. Moody assumes the ALJ and trial court had to credit statements in documents submitted by the partners. Given the findings of the ALJ and trial court, described earlier, those documents were discredited.

Moody blames the Department for hounding an innocent disabled veteran, to "deflect media and legislative criticism" away from the Department. This ad hominem attack is unsupported by the findings of the ALJ or trial judge. It

is unseemly, and unpersuasive. (*People ex rel. Lockyer v. Brar* (2004) 115 Cal.App.4th 1315, 1318–1319 [9 Cal.Rptr.3d 844].)

 As the appellant, Moody had a duty to state the evidence fairly, and his failure to do so forfeits his evidentiary claims. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; *Overaa Construction v. California Occupational Safety & Health Appeals Bd.* (2007) 147 Cal.App.4th 235, 251 [54 Cal.Rptr.3d 154].)

## DISPOSITION

The judgment is affirmed as to Niles Freeman Equipment, Daniel Moody and Moody Construction, and those parties shall pay the Department's costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

Sims, Acting P. J., and Davis, J., concurred.

## APPENDIX

Military and Veterans Code section 999.9, as amended effective January 1, 2004 (Stats. 2003, ch. 632, § 4):

"(a) It shall be unlawful for a person to:

"(1) Knowingly and with intent to defraud, fraudulently obtain, retain, attempt to obtain or retain, or aid another in fraudulently obtaining or retaining or attempting to obtain or retain, certification as a disabled veteran business enterprise for the purpose of this article.

"(2) Willfully and knowingly make a false statement with the intent to defraud, whether by affidavit, report, or other representation, to a state official or employee for the purpose of influencing the certification or denial of certification of any entity as a disabled veteran business enterprise.

"(3) Willfully and knowingly obstruct, impede, or attempt to obstruct or impede, any state official or employee who is investigating the qualifications of a business entity that has requested certification as a disabled veteran business enterprise.

"(4) Knowingly and with intent to defraud, fraudulently obtain, attempt to obtain, or aid another person in fraudulently obtaining or attempting to obtain, public moneys, contracts, or funds expended under a contract, that are awarded by any state agency, department, officer, or other state governmental agency, to which the person is not entitled under this article.

"(5) Knowingly and with intent to defraud, fraudulently represent participation of a disabled veteran business enterprise in order to obtain or retain a bid preference or a state contract.

"(6) Willfully and knowingly make or subscribe to any statement, declaration, or other document that is fraudulent or false as to any material matter, whether or not that falsity or fraud is committed with the knowledge or consent of the person authorized or required to present the declaration, statement, or document.

"(7) Willfully and knowingly aid or assist in, or procure, counsel, or advise, the preparation or presentation of a declaration, statement, or other document that is fraudulent or false as to any material matter, regardless of whether that falsity or fraud is committed with the knowledge or consent of the person authorized or required to present the declaration, statement, or document.

"(8) Willfully and knowingly fail to file any declaration or notice with the awarding agency that is required by Section 999.2.

"(9) Establish, or knowingly aid in the establishment of, or exercise control over, a firm found to have violated any of paragraphs (1) to (8), inclusive.

"(b) Any person who violates any of the provisions of subdivision (a) shall be guilty of a misdemeanor punishable by imprisonment in the county jail not exceeding six months or by a fine not exceeding one thousand dollars ($1,000), or by both. In addition, the person shall be liable for a civil penalty of not less than ten thousand dollars ($10,000) nor more than thirty thousand dollars ($30,000) for the first violation, and a civil penalty of not less than thirty thousand dollars ($30,000) nor more than fifty thousand dollars ($50,000) for each additional or subsequent violation. A defendant who violates any of the provisions of subdivision (a) shall pay all costs and attorney's fees incurred by the plaintiff in a civil action brought pursuant to this section.

"(c)(1) The Department of General Services shall suspend any person who violates subdivision (a) from bidding on, or participating as either a contractor, subcontractor, or supplier in, any state contract or project for a period of not less than three years, and if certified as a disabled veteran business enterprise, the department shall revoke the business' certification for a period of not less than three years. An additional or subsequent violation shall extend the periods of suspension and revocation for a period of not less than five years. The suspension and revocation shall apply to the principals of the business and any subsequent business formed or financed by, or affiliated with, those principals.

"(2) The Department of General Services shall prohibit any business or person who fails to satisfy the penalties, costs, and attorney's fees imposed pursuant to subdivision (b) from further contracting with the state until the penalties are satisfied.

"(d) The awarding department shall report all alleged violations of this section to the Department of General Services. The Department of General Services shall subsequently report all alleged violations to the Attorney General who shall determine whether to bring a civil action against any person or firm for violation of this section.

"(e) The Department of General Services shall monitor the status of all reported violations and shall maintain and make available to all state departments a central listing of all firms and persons who have been determined to have committed violations resulting in suspension.

"(f) No awarding department shall enter into any contract with any person suspended for violating this section during the period of the person's suspension. No awarding department shall award a contract to any contractor utilizing the services of any person as a subcontractor suspended for violating this section during the period of the person's suspension.

"(g) The awarding department shall check the central listing provided by the Department of General Services to verify that the person or contractor to whom the contract is being awarded, or any person being utilized as a subcontractor or supplier by that person or contractor, is not under suspension for violating this section."