Filed 3/23/22  The Metropolitan Water Dist. of S. Cal. v. Collins CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> R. DOUGLAS COLLINS, <br><br> Defendant and Respondent. | B305990 <br><br> Los Angeles County <br> Super. Ct. No. 19STCP00437 |
| EMPLOYEES ASSOCIATION OF THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA / AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, LOCAL 1902, AFL/CIO, <br><br> Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mitchell Beckloff, Judge. Affirmed.

Marcia L. Scully, Heather C. Beatty, Henry Torres, Anthony Allen Zepeda; Atkinson, Andelson, Loya, Ruud & Romo, Nate J. Kowalski and Jennifer D. Cantrell for Plaintiff and Appellant.

Rothner, Segall & Greenstone, Eli Naduris-Weissman and Jonah J. Lalas for Real Party in Interest and Respondent.

———————————

The Metropolitan Water District of Southern California (Metro) fired Timothy Leuschner for fighting another employee, violating its no-smoking policy, and insubordination. Leuschner's union, American Federation of State, County & Municipal Employees, Local 1902 (AFSCME), appealed Metro's decision to a neutral hearing officer. At the hearing, Metro sought to prove Leuschner was the aggressor who intentionally harmed the other employee. The hearing officer instead found the other employee initiated the physical altercation by headbutting Leuschner in the face, and Leuschner used force to defend himself. The hearing officer also found Metro's other bases for terminating Leuschner were unpersuasive. Accordingly, it ordered Metro to reduce Leuschner's discipline to a three-week suspension.

On appeal, Metro argues the hearing officer abused his discretion because he failed to consider relevant factors and evidence, his findings lack the support of substantial evidence, and his findings do not support his decision. Metro also argues the hearing officer lacked authority to impose a suspension. We affirm.

2

# FACTUAL AND PROCEDURAL BACKGROUND

Metro is a governmental agency that imports, stores, and distributes water to member agencies, which in turn sell the water to consumers. Leuschner began working for Metro in July 2006 as a Water Treatment Operator at its Diemer Water Treatment Plant (Diemer Plant). Leuschner worked in the Diemer Plant's control room, monitoring and adjusting equipment that pumps and treats water before distributing it to various cities and water districts. Leuschner consistently received high performance evaluations from his supervisors.

Sometime in 2016, Metro modified its no-smoking policy to include electronic cigarettes (e-cigarettes). Metro informed Diemer Plant employees about the change in policy at a "toolbox safety meeting."

Most Metro operators, including Leuschner, worked a grueling schedule consisting of seven days on, followed by seven days off. The operators alternated between working day shifts and night shifts. Each shift was 12 and a half hours long.

Around 5:00 a.m. on March 20, 2017, Leuschner's manager, David Miller, sent an email to several individuals—but not Leuschner—informing them he would be on leave and Daryl Norman would be "acting manager" during his absence. Like Leuschner, Norman was a Water Treatment Operator. Norman, however, generally did not work in the control room. Norman held a "T-5 certification" from the State of California, which was higher than Leuschner's certification.

Around 6:00 a.m. that morning, Leuschner was working in the control room, preparing for the end of his fifth night shift in a row. Norman walked into the control room and noticed Leuschner "vaping" an e-cigarette. Norman said something

3

to the effect of, "[Leuschner], are you really smoking in here?" Leuschner rolled his eyes. Norman and Leuschner had a heated verbal exchange that eventually turned physical. We describe the fight in more detail below.

Leuschner suffered minor injuries from the fight. Norman suffered a cut on his forehead, which required stiches. Norman claimed he suffered other, more serious injuries as well, which we discuss below.

Shortly after the fight ended, Leuschner told another manager he had an argument with Norman over vaping, and then Norman headbutted him. Leuschner said he threw Norman to the ground twice and kicked him.

1. ***Metro's Discipline***

A Metro security specialist, Mark Sovern, investigated the incident and made three findings: (1) Leuschner violated Metro's no-smoking policy by using an e-cigarette in the control room; (2) Leuschner and Norman engaged in physical combat in violation of Metro policy; and (3) it is not possible to determine who struck the first blow.

After Sovern's investigation, Metro issued both Leuschner and Norman notices that it intended to discharge them. Leuschner's notice cited the following reasons for his dismissal: (1) insubordination; (2) fighting; (3) harassing, threatening, intimidating, or coercing another employee; (4) failure to work cooperatively with others; (5) engaging in an activity that creates a safety, fire, or security hazard; (6) smoking in restricted areas or where "no smoking" signs are posted or otherwise violating Metro's no-smoking policy; and (7) failure to meet acceptable performance standards.

Metro held pre-discipline *Skelly* hearings[1] to allow Leuschner and Norman opportunities to respond to its proposed discipline. At his hearing, Leuschner initially denied recalling whether he kicked Norman during the fight. Later, he claimed he never kicked Norman.

The *Skelly* hearing officer, Stephen Lem, issued decisions sustaining the recommended discipline against Leuschner, but reducing Norman's discipline to a three-week suspension. Lem explained he was persuaded to uphold Leuschner's termination based on the fact that the "incident escalated to a full blown physical altercation, due in large part to [Leuschner's] violation of [the no-smoking policy] compounded by [his] insubordination towards an acting Team Manager. These acts, combined with a very serious physical altercation that resulted in Mr. Norman being hospitalized, constitute a sequence of events that cannot be tolerated." In reducing Norman's discipline, Lem explained that, although Norman "deserve[d] a fair share of the blame for the physical altercation," he did not violate the no-smoking policy or engage in insubordination.

2.     *The administrative appeal*

Leuschner's union, AFSCME, appealed the termination of his employment per the terms of its memorandum of understanding (MOU) with Metro. A neutral officer conducted

---

[1]     Before a civil service employee can be fired for cause, the employee is entitled to a "probable-cause-type proceeding," known as a *Skelly* hearing, after our Supreme Court's announcement of this right in *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 215–216 (*Skelly*). (Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2021) ¶ 3:196.)

an evidentiary hearing over the course of several days.  At the start of the hearing, the parties stipulated that the officer was to decide the following issues:  "Was Timothy Leuschner discharged by [Metro] for just (proper) cause?  If not, what shall be the remedy?"

Leuschner testified at the hearing that he was vaping an e-cigarette in the control room when Norman said, "Are you smoking?  Are you vaping?"  At the time, Leuschner did not know Metro's no-smoking policy prohibited e-cigarettes.  Leuschner did not attend the "toolbox" meeting at which Metro discussed the policy, either because he was working in the control room or was off duty.  Leuschner had previously smoked e-cigarettes in front of his regular manager, who did not object.

Leuschner claimed he put the e-cigarette down and turned to face Norman.  Norman said, " 'You can't smoke that shit in here.' "  Leuschner told Norman, " '[Y]ou don't have to be in here. You can fucking leave. . . .  You're not an operator.' "  Norman replied, " 'Well, I'm the acting supervisor today.' "  Leuschner thought Norman's response was a "half-hearted attempt to make [him] feel like [he] shouldn't be in his face."  Leuschner told Norman his "T-5 [certification] doesn't mean anything; to fucking shove [the certification] up his ass . . . ."  At the hearing, Leuschner said if the Pope yelled at him at 6:00 a.m. after his fifth night shift in a row, he would have said, " 'What the heck?' " and gotten in the Pope's face as well.

According to Leuschner, he and Norman were about 18 inches apart as they continued to argue.  At some point, Norman headbutted Leuschner in the face.  Leuschner responded by grabbing Norman and throwing him to the floor.  Norman abruptly got up and "bull-rushed" Leuschner, pushing him

up against a console.  Leuschner grabbed Norman and threw him over his shoulder, onto the console.  Norman rolled over onto his side, punched Leuschner three time in the ribs, and tried to punch Leuschner in the face.  Leuschner pulled Norman off the console and threw him to the ground to try to put some distance between them.  Norman's head hit the ground, which made a "sickening" sound.  Leuschner thought Norman was unconscious.  Norman, however, quickly pushed himself off the ground, onto his hands and knees.

Based on how quickly Norman popped up off the ground, Leuschner thought he was going to attack again.  Leuschner panicked and kicked Norman on his cheek.  Leuschner demonstrated the kick during the hearing, which the hearing officer characterized as a "light[ ] kick[ ]."

Norman got up slowly and looked dazed.  He walked into the kitchen, and Leuschner followed him, asking, " 'Why did you do that?' "  Norman responded, " 'Go home, [Leuschner].' "

Leuschner left the kitchen and went to find his manager, Wes Wiggs.  According to Wiggs, Leuschner was nervous and "upset at himself," and he immediately said something to the effect of "I messed up."  Leuschner told Wiggs that Norman started the physical altercation by headbutting him.

Norman claimed to remember very little about the altercation.  According to Norman, he was talking to another employee in the control room when he noticed smoke out of the corner of his eye.  He turned to Leuschner and said, "Are you really smoking in here?"  Leuschner rolled his eyes, got out of his chair, and approached Norman.  They had a heated verbal exchange, and Norman could feel the spit from Leuschner's mouth as he was yelling.

Norman could not remember whether he headbutted Leuschner, but he did not believe he did. He felt cornered, and the next thing he remembered was falling off the desk onto the ground. Norman woke up on the ground and noticed blood in front of him. He eventually got up and went into another room. According to Norman, in addition to the cut on his forehead, he suffered cuts on his lip, chin, and cheek, a bruised bicep, a sprained back, and a hairline fracture around his knee.

Three other Metro employees were in the control room during the fight: David Murphy, Barry Veale, and Randall Scott Lee. None of the employees saw how the physical fight started, but their accounts of the altercation were generally consistent with Leuschner's testimony. Two of the employees did not know at the time that Metro had a policy prohibiting e-cigarettes.

### 3. *Metro's post-hearing brief*

In its post-hearing brief, Metro represented that, although it cited several bases for disciplining Leuschner, in essence, it terminated him for fighting. Therefore, according to Metro, "Leuschner's appeal will hinge in the final analysis on whether the workplace violence at issue warrants termination." Metro insisted the evidence shows Leuschner was the aggressor and he engaged in a series of deliberate acts to inflict physical harm on Norman. It argued it acted appropriately in imposing different discipline on Leuschner and Norman because they were not equally culpable or equally engaged in misconduct.

### 4. *The hearing officer's decision*

The hearing officer concluded Metro did not have just cause to terminate Leuschner, and it ordered Metro to impose a three-week suspension instead. The officer found that, although Leuschner and Norman engaged in "mutual combat,"

it "was Norman who initiated the confrontation by approaching within 18 inches of [Leuschner] during their argument regarding [Leuschner's] vaping and then suddenly lunged forward and headbutted [Leuschner], striking him in his face. . . . Given that conclusion, it is irrelevant that Norman suffered greater injury than [Leuschner] as [Leuschner] was simply defending himself from attack."[2] The officer found Leuschner to be "forthright and credible" while testifying at the hearing, whereas Norman "seemed somewhat glib if not evasive."

The hearing officer further found Metro's other reasons for terminating Leuschner—his violation of the no-smoking policy and insubordination—were not persuasive. As to insubordination, the officer found Metro did not notify Leuschner and other employees in the control room that Norman was the acting manager. Although there was evidence suggesting Norman informed Leuschner of that fact during their argument, the officer found it would be unreasonable to expect Leuschner to simply take Norman's word for it without confirmation from a higher authority, especially given the circumstances.

---

[2] In criminal law, " 'mutual combat' " is a term of art that means "fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1046–1047.) It does not appear the hearing officer intended to use the phrase in that way, as it would be inconsistent with his findings that Norman initiated the physical altercation and Leuschner was defending himself from attack. Instead, it seems the officer used the phrase in a colloquial sense to mean both parties used physical force against each other. (*Id.* at p. 1044 ["In ordinary speech . . . 'mutual combat' might properly describe any violent struggle between two or more people, however it came into being."].)

The officer also found the undisputed evidence showed Metro never informed Leuschner of its policy prohibiting e-cigarettes.

The officer further explained that, even if it were not clear who started the physical altercation, the "extreme difference in the disciplinary penalties meted out to [Leuschner] and Norman were . . . unjustified, particularly given that [Metro] concluded that Norman had acted improperly. Moreover, it appears from the record evidence that the discharge of [Leuschner] was also disproportionate to that imposed by [Metro] in previous cases of fighting." In addition, the officer noted Leuschner was a long-term employee with excellent reviews and no prior discipline, and management regarded him highly.

**5.** ***Metro's w****rit petition*

Metro challenged the hearing officer's decision by filing a petition for writ of mandate in the superior court under Code of Civil Procedure section 1094.5.[3] Metro made three main arguments in support of its petition. First, it argued the hearing officer exceeded his authority under the MOU by imposing a suspension. According to Metro, under the MOU, the hearing officer only could sustain or revoke its chosen discipline. Second, Metro argued the hearing officer's own findings showed Leuschner was insubordinate and violated the no-smoking policy. Finally, it argued there is insufficient evidence supporting the hearing officer's findings that Norman was the instigator and that Norman and Leuschner were equally culpable.

At oral argument, the superior court pointed out that the MOU does not expressly grant the hearing officer the

---

[3]     All future undesignated statutory references are to the Code of Civil Procedure.

10

authority to remand a case to Metro to impose lesser discipline. Therefore, under Metro's reading of the MOU, if the officer found Leuschner's discipline was excessive and revoked it, Leuschner would return to work without any punishment. Metro responded, "Well, hypothetically, I can't argue with that scenario." Metro said, in that situation, its recourse would be to challenge the sufficiency of the evidence supporting the hearing officer's decision to revoke.

### 6.      *The superior court's decision*

The superior court granted the petition in part and remanded the case to the hearing officer to reconsider his decision. The court found the MOU granted the hearing officer implied authority to modify Leuschner's discipline. The court alternatively found Metro granted the hearing officer authority to impose a suspension by stipulating that he could decide the appropriate remedy in the event he revoked Leuschner's termination.

The court, however, determined substantial evidence does not entirely support the hearing officer's determination that Norman " 'initiated the confrontation.' " The court explained that the officer's determination was based on three other findings: (1) Norman approached Leuschner within 18 inches during their argument; (2) Norman suddenly lunged forward; and (3) Norman headbutted Leuschner in the face. The court found substantial evidence supports the second and third findings, but not the first one. The court, therefore, granted the petition in part and remanded the matter to the hearing officer to reconsider his decision in light of the lack of evidence supporting his finding that Norman approached Leuschner within 18 inches.

Metro timely appealed.[4]

## DISCUSSION

### 1. *Standard of review*

Under section 1094.5, a party may petition for judicial review of an administrative "decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer." (§ 1094.5, subd. (a).) The judicial inquiry extends to whether the decisionmaker "has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (*Id.*, subd. (b).) An administrative decisionmaker abuses its discretion if it "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

The standard of review in a section 1094.5 proceeding depends on whether the administrative decision substantially affects a fundamental vested right. " 'It is well-established that an employer's right to discipline or manage its employees . . . is *not* a fundamental vested right . . . .' " (*County of Los Angeles*

---

[4] Although the superior court remanded the matter to the hearing officer for reconsideration, because the court did not reserve jurisdiction to consider any issues, its judgment is final and immediately appealable. (See *Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1116–1117; Asimow et al., Cal. Practice Guide: Administrative Law, *supra*, ¶ 21:30 ["[i]f a trial court grants a writ of mandate against an agency that remands the case back to that agency for further consideration, *but without retaining jurisdiction over the case*, the agency is entitled to appeal the trial court decision"].)

12

*v. Civil Service Com.* (1995) 39 Cal.App.4th 620, 633.) As a result, we do not review the superior court's decision; instead, we directly review the hearing officer's decision using the substantial evidence test. (*Ibid.*)

Under this standard of review, we "view the evidence in the light most favorable to the [hearing officer's decision] and accept as true all evidence tending to support [it], including all facts that reasonably can be deduced from the evidence." (*Pedro v. City of Los Angeles* (2014) 229 Cal.App.4th 87, 99.) We must uphold the decision if, viewed in this light, the record discloses substantial evidence to support the hearing officer's findings. (See *San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1461.)

**2.      *The hearing officer's decision does not manifest an indifference to the* Skelly *factors***

Metro contends the hearing officer failed to proceed in the manner required by law because his decision manifests an indifference to the factors identified by the Supreme Court in *Skelly*, *supra*, 15 Cal.3d 194.[5] In *Skelly*, our state's high court explained that to determine whether an administrative body abused its discretion when imposing discipline on a public employee, "the overriding consideration . . . is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[harm] to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the

---

[5]     To the extent AFSCME argues Metro forfeited this issue by failing to raise it below, we disagree. Under *Skelly*, we are obligated to consider whether the hearing officer's decision sufficiently accounts for the factors the Supreme Court identified. It is not an issue Metro can forfeit.

misconduct and the likelihood of its recurrence." (*Id.* at pp. 217–218.) A hearing officer abuses his or her discretion by issuing a decision that manifests an indifference to these factors.[6] (*Kolender v. San Diego County Civil Service Com.* (2007) 149 Cal.App.4th 464, 471 (*Kolender II*).)

According to Metro, the record shows Leuschner's misconduct was egregious: he violated its no-smoking policy, became belligerent when his manager—Norman—called him out for it, proceeded to assault Norman while he was defenseless, bragged about doing so, and then made clear he would not hesitate to use violence against a coworker in the future. Metro argues that, given these facts, the harm to the public service would be "extremely severe" if Leuschner were to return to the workplace, as there is a strong likelihood he will continue to engage in similar violent behavior. It also contends his return would effectively tell other employees they can "pick up, throw, body slam, kick, cut and curse out a manager and still keep his or her job . . . ." Further, Metro insists Leuschner created a significant threat to the health and safety of the public because his altercation with Norman occurred in the control room of a water treatment plant, and it caused disruption to computers and equipment consoles monitoring drinking water for millions of people.

---

[6] AFSCME insists *Skelly*'s emphasis on the harm to the public service does not apply to this case because the parties' relationship is governed by the MOU, which requires Metro to have "just cause" and employ "progressive discipline." We need not decide that issue because, even assuming *Skelly*'s emphasis on the harm to the public service applies, Metro has not shown error.

14

If the facts were as Metro presents them, we would have no trouble finding the hearing officer abused his discretion. Metro, however, erroneously views the evidence in the light most favorable to it, drawing all inferences to support its position and ignoring evidence to the contrary.[7] In doing so, Metro flips the standard of review on its head. (See *Pedro v. City of Los Angeles, supra*, 229 Cal.App.4th at p. 99.)

Metro also completely ignores the hearing officer's most crucial findings, which we must accept as true if supported by substantial evidence.[8] (*Menge v. Reed* (2000) 84 Cal.App.4th 1134, 1139.) It ignores, for example, the officer's findings that Leuschner did not know he was violating the no-smoking policy; Metro did not inform Leuschner of its policy prohibiting e-cigarettes; Leuschner reasonably doubted Norman was his acting manager; Norman made the initial physical contact by lunging at Leuschner and headbutting him in the face; and Leuschner, in turn, used force against Norman in order to defend himself.

---

[7] As just one example, Metro repeatedly insists Leuschner bragged about knocking out Norman. Although Metro does not cite evidence in the record to support this claim, we presume it is based on Christina Schiro's testimony that she overheard Leuschner tell Wes Wiggs, " 'I just knocked [Norman] out. He thinks he's my manager. He can't tell me what to do.' " Metro, however, wholly ignores Wiggs's testimony that Leuschner was "upset at himself" and immediately said something to the effect of " 'I messed up.' " In light of Wiggs's testimony, the hearing officer could have reasonably concluded Leuschner was not bragging.

[8] We address, and reject, Metro's substantial evidence arguments in other sections of this opinion.

Under the version of events the hearing officer found to be true, and viewing the evidence in the light most favorable to his decision, Leuschner's most serious transgression was getting into a heated verbal argument with Norman, whom he believed to be a coworker. While such misconduct might be sufficient to warrant termination, it certainly does not compel it. At the very least, reasonable minds could differ on the issue. (See *County of Los Angeles v. Civil Service Com.*, *supra*, 39 Cal.App.4th at p. 634 [" 'If reasonable minds may differ with regard to the appropriate disciplinary action, there is no abuse of discretion.' "].)

We reject Metro's contention that this case is comparable to several others in which courts held administrative bodies abused their discretion by failing to uphold an employer's decision to terminate an employee. (See *Hankla v. Long Beach Civil Service Com.* (1995) 34 Cal.App.4th 1216; *Cate v. State Personnel Bd.* (2012) 204 Cal.App.4th 270; *Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 716 (*Kolender I*); *County of Santa Clara v. Willis* (1986) 179 Cal.App.3d 1240.) In those cases, the administrative bodies found the employees shot someone during a road rage incident (*Hankla,* at pp. 1218–1221), lied to cover up a fellow employee's physical abuse of an inmate (*Kolender I*, at pp. 719–720), refused to assist a mentally ill inmate who was hallucinating and then compiled information to discredit the inmate as a witness in a subsequent internal investigation (*Cate*, at pp. 273–274, 285), and made sexual advances toward hospital patients and coworkers that amounted to criminal battery (*Willis*, at p. 1251). Such misconduct is significantly more egregious than the misconduct the hearing officer found in this case. Moreover, all but one of those employees were peace officers, who are

16

"held to higher standards of conduct than civilian employees" like Leuschner. (*Cate,* at p. 285.)

After crediting the hearing officer's factual findings and viewing the record in the light most favorable to his conclusions, we find the officer's decision does not manifest an indifference to the *Skelly* factors, including the harm to the public service. Although some of Leuschner's actions were undoubtedly inappropriate, the officer did not abuse his discretion by finding termination was excessive.

3. ***Metro has not shown the hearing officer failed to consider relevant factors***

Metro argues the hearing officer "manifestly abused his discretion by failing to consider, let alone analyze" various factors, including how Leuschner's conduct harmed the public service, the importance of Metro's zero-tolerance policy on violence, the dangers of smoking in the control room, and the "organizational impact Leuschner's return . . . would cause to the morale, safety, and the work habits of other employees."

Metro's insistence that the hearing officer abused his discretion on this basis is quite brazen given it, too, failed to expressly address many of these factors. In its post-hearing brief, Metro identified more than a dozen factors for the hearing officer to consider, and it discussed many of those factors in detail. Metro never explicitly mentioned the effect of Leuschner's actions on the public service or the dangers of smoking in the control room. Its failure to do so forfeits those issues on appeal. (See *Niles Freeman Equipment v. Joseph* (2008) 161 Cal.App.4th 765, 787 (*Niles*) ["We have repeatedly held that issues not presented at an administrative hearing cannot be raised on review."].)

17

Metro's arguments also fail on the merits.  It is a fundamental rule of appellate review that the reviewing court presumes the challenged decision is correct.  " 'All intendments and presumptions are indulged to support it on matters as to which the record is silent . . . .' " (*Denham v. Superior Court of Los Angeles County* (1970) 2 Cal.3d 557, 564.)  The appellant, moreover, bears the burden to demonstrate error affirmatively and show the error was prejudicial.  (*Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, 512.)

Metro has not met its burden here.  It points to nothing in the record showing the hearing officer failed to consider all the factors it identifies.  Nor does it point to any authority that would have required the officer to analyze those factors expressly in his decision.  Absent such authority, Metro has not shown the hearing officer abused his discretion on this basis.

4. ***Metro has not shown the hearing officer erroneously failed to consider relevant evidence***

Metro argues the hearing officer committed clear error by failing to consider evidence of Leuschner's dishonesty during the *Skelly* hearing about whether he kicked Norman.  In declining to consider the evidence, the hearing officer explained that Metro's notice of intent did not list dishonesty as a basis for terminating Leuschner; nor did the *Skelly* officer's decision cite it as a reason for upholding the termination.

Relying on *In the Matter of the Appeal from the Termination of [Appellant] v. City of [Respondent]*, 1999 BNA LA Supp. 10895 (Gould 1999), Metro insists Leuschner's dishonesty was relevant to whether it assessed an appropriate level of discipline in response to his other misconduct.  We agree.  The fact that Leuschner refused to acknowledge alleged

misconduct tends to show he is likely to engage in similar behavior in the future.  (See, e.g., *In re Marriage of Emilie D.L.M. & Carlos C.* (2021) 64 Cal.App.5th 876, 882 [" '[o]ne cannot correct a problem one fails to acknowledge' "].)  Metro, however, did not specifically urge the hearing officer to consider the evidence for that purpose.  Instead, in its post-hearing brief, Metro argued Leuschner's dishonesty supported its decision to terminate him because it undermined its confidence in him as an operator assigned to a crucial position.  Phrased in that way, Metro suggested Leuschner's dishonesty was itself misconduct that warranted discipline.  This was improper, as it bypassed the grievance procedure set forth in the MOU. The hearing officer, therefore, correctly declined to consider the evidence for that purpose.

Metro further claims the hearing officer failed to consider many other pieces of evidence.  Specifically, it contends the officer ignored evidence showing Leuschner became belligerent after Norman told him not to vape, had opportunities to verify that Norman was the acting manager, continued to attack Norman after he was defenseless, boasted to his manager that he knocked out Norman, and suggested he would engage in similar conduct in the future.  It also argues the hearing officer ignored evidence showing Norman and Leuschner were not equally culpable or equally engaged in misconduct.

Metro does not point to anything in the record showing the hearing officer failed to consider this evidence.  (See *Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 432 ["The absence of discussion of the evidence on the record does not mean that the [administrative body] failed to consider the evidence."].) Nor has it shown the evidence compels a finding in its favor

19

as a matter of law. Metro's arguments, therefore, appear to be nothing more than thinly veiled attempts to have us reweigh the evidence, which we will not do. (See *Camarena v. State Personnel Bd.* (1997) 54 Cal.App.4th 698, 701 [a reviewing court does not reweigh the evidence].)

**5.** ***The hearing officer did not exceed his authority by imposing a suspension***

Metro contends the hearing officer exceeded his authority by imposing a three-week suspension on Leuschner, rather than simply revoking its decision to discharge him. In support, Metro relies on section 6.7.6(B) of the MOU, which states "[t]he decision of the Hearing Officer may sustain or revoke the disciplinary action or second level grievance response and shall be final and binding on the parties." Metro insists that under this provision, a hearing officer only has two options: sustain the discipline or revoke it.

Assuming for the sake of argument that Metro correctly interprets the MOU, the hearing officer nevertheless properly imposed a suspension under the authority the parties granted him by stipulation. An arbitrator's powers derive from, and are limited by, the parties' agreement to arbitrate. (*Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534, 543.) Nevertheless, the parties " 'may submit for decision issues they were not contractually compelled to submit to arbitration. In such event, courts look both to the contract *and* to the scope of the submissions to determine the arbitrator's authority.' [Citations.]" (*Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, 1438; see *Kelly Sutherlin McLeod Architecture, Inc. v. Schneickert* (2011) 194 Cal.App.4th 519, 529 ["The

20

arbitrator's powers may be expanded or restricted by the scope of the issues submitted to arbitration."].)[9]

Here, the parties submitted the following issues to the hearing officer: "Was Timothy Leuschner discharged by [Metro] for just (proper) cause? If not, what shall be the remedy?" According to Metro, the MOU authorized the hearing officer to order only one remedy in the event he found Metro did not have just cause to discharge Leuschner: revocation of the termination. Therefore, by expressly asking the hearing officer to determine the proper remedy, Metro must have contemplated and agreed that the officer could order a remedy other than revocation. Metro does not argue otherwise.[10]

---

[9] We find arbitration authority instructive because, although the MOU's hearing procedure is not identical to binding arbitration, it shares many of the same features. (See *American Federation of State, County & Municipal Employees v. Metropolitan Water Dist.* (2005) 126 Cal.App.4th 247, 258.) Our Supreme Court, moreover, has considered arbitration authority in the context of a case involving the discharge of a public employee. (See *Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 770, fn. 13.)

[10] It is not surprising Metro would agree to grant the hearing officer such authority. At oral argument before the superior court, Metro conceded that its interpretation of the MOU could lead to unwanted results absent such a stipulation. Specifically, because the MOU does not have a remand provision, if a hearing officer found an employee engaged in misconduct but Metro imposed discipline that was too severe, the employee would face no discipline. Metro could easily avoid such an outcome by stipulating to allow the arbitrator to determine the proper level of discipline.

Nevertheless, Metro seems to argue that under *Valencia v. County of Sonoma* (2007) 158 Cal.App.4th 644 (*Valencia*), its stipulation was somehow void.  In *Valencia*, a county terminated an employee, who in turn appealed to a civil service commission in accordance with the terms of an MOU.  The commission vacated the termination, but imposed an alternative form of discipline that the MOU did not authorize.  (*Id*. at p. 646.)  On appeal, the county argued the commission was not a party to the MOU, so it was free to impose any form of discipline.  (*Id*. at p. 649.)  The court rejected the county's position, explaining it would be contrary to policy because it would allow the county and its employees "to escape the negotiated, voluntary constraints the MOU would otherwise place on their conduct merely by appealing to the Commission . . . ."  (*Id*. at pp. 649–650.)  In other words, it would render certain terms in the MOU non-binding and illusory.

Metro contends *Valencia* stands for the proposition that a hearing officer is bound to follow the terms of the parties' MOU, even if the parties stipulate otherwise.  We fail to see how Metro arrives at this conclusion.  *Valencia* did not involve a stipulation or anything comparable.  Nor does the court's rationale apply to stipulations.  The court rejected the county's position because it would have allowed either party to *unilaterally* avoid certain terms of the MOU.  There is no similar concern where, as here, the parties *mutually* agree to grant the hearing officer authority to determine an issue not mandated by the MOU.

Metro's reliance on *Metropolitan Water Dist. of Southern California v. Winograd* (2018) 24 Cal.App.5th 881 (*Winograd*), is also misplaced.  In that case—which involved the same parties and MOU as this case—Metro and AFSCME asked a hearing

22

officer to decide whether Metro violated the MOU by using a " ' "comparative analysis" ' " procedure in connection with a specific job posting and, if so, what is the proper remedy. (*Id.* at p. 888.) During the hearing, the parties stipulated that Metro did not use comparative analysis on any internal candidates in connection with the posting. Nevertheless, the hearing officer ordered Metro to cease and desist using comparative analysis on internal candidates in the future. (*Id.* at p. 890.) The court held the hearing officer exceeded his authority by deciding an unripe claim and rendering a decision beyond the scope of the issue before him. (*Id.* at pp. 894–895.) The court alternatively found that, even if the parties asked the officer to consider the general use of the comparative analysis procedure, he exceeded his authority because the MOU expressly authorized Metro to use comparative analysis when making employment decisions. (*Id.* at pp. 895–896.) As a result, the hearing officer's decision violated section 6.7.6(A) of the MOU, which states "[t]he decision of the Hearing Officer shall not add to, subtract from, or otherwise modify the terms and conditions of this MOU."

Winograd is of no help to Metro. The hearing officer's decision in that case precluded Metro from doing something expressly permitted under the MOU. Here, the officer's decision did nothing comparable. Instead, it merely ordered Metro to impose a suspension, which is a form of discipline the MOU expressly authorizes. As such, the officer's decision does not violate section 6.7.6(A) of the MOU.

**6.** ***The hearing officer did not abuse his discretion by concluding Metro could not discipline Leuschner for insubordination***

The hearing officer concluded Metro could not discipline Leuschner for insubordination because Leuschner did not know Norman was his acting manager. Metro argues substantial evidence does not support this finding. In support, it points to evidence showing Norman identified himself as the acting manager, Leuschner knew Metro often assigned Norman acting manager status, and, after the fight, Leuschner said something to the effect of "Norman thinks he's my manager."

Once again, Metro views the record in the light most favorable to it, while simply ignoring the evidence supporting the hearing officer's finding. Specifically, it ignores the undisputed evidence showing Leuschner's regular manager announced Norman to be the acting manager about an hour before the altercation. The regular manager did not tell Leuschner he was leaving or that Norman was the acting manager in his absence. Although Norman subsequently informed Leuschner of his status, he did so in the midst of a heated argument. Based on this evidence, the hearing officer reasonably concluded Leuschner justifiably doubted the veracity of Norman's claim. Because there is substantial evidence supporting the hearing officer's finding, it is irrelevant that substantial evidence might also support a contrary finding. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874.)

Metro alternatively insists the hearing officer's own findings demonstrate Leuschner knew Norman was his acting manager. Specifically, it points to the officer's findings that after Norman announced he was the acting manager, Leuschner

24

responded that Norman's T-5 certification "doesn't mean anything; to fucking shove it up [Norman's] ass, as far as I'm concerned." According to Metro, Leuschner's response "did not express any indicia of doubt but rather defiance to being placed on notice of Norman's supervisory status and to receiving direction to stop vaping."

Metro points to no evidence showing Norman's T-5 certification was connected to his status as acting manager, or, more importantly, that Leuschner believed that to be the case. Absent such a connection, Leuschner's comments actually support the hearing officer's finding that he did not realize Norman was acting manager. Indeed, they suggest Leuschner believed Norman gave him orders under supposed authority arising out of his T-5 certification, rather than authority arising out of his status as acting manager.

7. ***Metro has not shown the hearing officer abused his discretion by disregarding evidence of Norman's injuries***

Metro argues the hearing officer erroneously rejected evidence showing Norman suffered greater injuries than Leuschner. The hearing officer reasoned that such evidence was irrelevant because Leuschner was "simply defending himself from attack." Metro insists this conclusion is not supported by substantial evidence. According to Metro, the evidence instead shows Leuschner needlessly escalated the conflict by flipping Norman over his shoulder onto a console, throwing Norman to the ground causing his head to strike the floor, and then kicking Norman in the face while he was defenseless.

In making this argument, Metro completely ignores the evidence showing the context in which Leuschner did

25

these things.  Leuschner, for example, testified that he initially threw Norman to the ground because Norman headbutted him in the face.  Rather than walk away and end the conflict, Norman "bull-rushed" Leuschner and pushed him up against a console.  Leuschner reacted by flipping Norman over his shoulder onto the console.  Norman then continued to attack, punching Leuschner three times in the ribs and attempting to punch him in the face.  At that point, Leuschner threw Norman onto the ground in order to put some space between them.  Norman quickly pushed himself off the ground in such a way that Leuschner feared he was going to attack again.  Leuschner panicked and lightly kicked Norman in the face.  Based on this evidence, the hearing officer reasonably concluded Leuschner was simply defending himself from Norman's attack.  Metro's arguments regarding the extent of Norman's injuries, therefore, lack merit.

8.  ***The hearing officer did not abuse his discretion by concluding Metro could not discipline Leuschner for vaping***

The hearing officer concluded Metro lacked just cause to impose discipline on Leuschner for vaping because Metro did not give him notice of its policy prohibiting e-cigarettes.  Metro posits various reasons why this was an abuse of discretion, none of which is persuasive.

First, Metro argues the undisputed evidence shows Leuschner became aware of its no-vaping policy when Norman said something to the effect of "you can't [vape] in here."  Even if that were true, there is no evidence that Leuschner continued to vape after Norman made the comment.  To the contrary, Leuschner testified that he put the e-cigarette down after

26

Norman asked if he was vaping, but before Norman said, " 'You can't [do] that . . . in here.' "

Next, Metro argues the record shows that, even if Leuschner did not receive actual notice of the policy, he received constructive notice because the policy was written, published, and circulated to other employees. Metro also points out that, at the time of the incident, state law prohibited vaping in places of employment. (See Lab. Code, § 6404.5; Bus. & Prof. Code, § 22950.5, subd. (c).)

Initially, Metro did not make these arguments at the administrative hearing, which forfeits them on appeal. (See *Niles, supra*, 161 Cal.App.4th at p. 787.) In any event, the hearing officer could have reasonably concluded it would be unfair to impute constructive knowledge to Leuschner under the circumstances of this case. The evidence shows Metro informed employees of the no-vaping policy during a meeting that Leuschner could not attend. Metro points to no evidence showing it made other attempts to inform Leuschner of the policy, or that it made the written policy readily accessible to him. Leuschner, moreover, testified that he previously vaped in front of his manager, who said nothing in response. On this record, the hearing officer could have reasonably concluded it would be unjust to impute constructive knowledge to Leuschner and impose discipline on that basis. (See *Cranston v. City of Richmond, supra*, 40 Cal.3d at p. 770, fn. 13 [" 'A fundamental component of the just-cause standard is that employees must be told what kind of conduct will lead to discipline—especially if the penalty is to be discharge.' "].)

Finally, Metro argues the hearing officer committed reversible error by failing to make a specific finding as to whether

Leuschner violated its Administrative Code, which prohibits "[s]moking in restricted areas or where 'No Smoking' signs are posted or otherwise violating [Metro's] 'No Smoking' Policy." There are numerous problems with this argument. First, Metro forfeited the issue by failing to specifically ask the hearing officer to uphold Leuschner's termination on this basis. (See *Niles, supra*, 161 Cal.App.4th at p. 787.) Second, it is not clear that "smoking" as used in the Administrative Code includes e-cigarettes. Finally, Metro fails to point to evidence in the record showing "no smoking" signs were posted in the control room, or that Leuschner was aware it was a restricted area. Accordingly, it has not shown the hearing officer's failure to make a finding on the issue was prejudicial.

9. ***Metro has not shown the hearing officer abused his discretion by considering evidence of disparate treatment***

The hearing officer noted in his decision that, even if it were not clear who escalated the verbal argument to a physical fight, Metro's termination of Leuschner was excessive in light of the fact that it suspended Norman for similar misconduct. The officer also noted that Metro had previously suspended, rather than terminated, other employees for fighting. Metro argues the hearing officer erred by considering evidence of these other disciplinary actions, including the fact that it suspended Norman.

As is a recurring theme, Metro forfeited this issue by failing to raise it below. Metro did not object when AFSCME introduced evidence of Metro's discipline of other employees. Nor did it object when AFSCME's counsel explicitly argued that Metro engaged in disparate treatment. Instead, Metro seemed to accept

28

that disparate treatment was a valid issue, as it devoted a substantial portion of its post-hearing brief to arguing it was justified in imposing different discipline on Leuschner and Norman because they were not equally culpable. Metro did the same in connection with its writ petition before the superior court. Having lost that issue below, Metro now claims the hearing officer erred by even considering evidence of disparate treatment. Metro's failure to raise the issue in a timely manner provides a sufficient reason to deny its claim on appeal. (See *Niles, supra*, 161 Cal.App.4th at p. 787.)

Even on the merits, Metro's argument fails. Metro cites authority standing for the proposition that disparate treatment is not a sufficient reason to overturn an employer's disciplinary decision. (See *Marino v. City of Los Angeles* (1973) 34 Cal.App.3d 461, 466; *Kolender II, supra*, 149 Cal.App.4th at p. 473; *Pegues v. Civil Service Com.* (1998) 67 Cal.App.4th 95, 106.) While that may be true, it does not follow that evidence of disparate treatment is wholly irrelevant. Here, for example, the fact that Metro did not terminate other employees who engaged in similar misconduct, including Norman, suggests it overstated the negative impact of Leuschner's misconduct. Accordingly, the hearing officer did not abuse his discretion by considering such evidence.[11]

---

[11] We also reject Metro's passing suggestion that the hearing officer was required to make explicit factual findings regarding the other incidents of misconduct. In support, Metro cites *Talmo v. Civil Service Com.* (1991) 231 Cal.App.3d 210, but the court in that case held no such thing.

## DISPOSITION

We affirm the judgment.  AFSCME is awarded its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


EDMON, P. J.


VIRAMONTES, J.*

---

<sup></sup>

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.